IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TANITA CORPORATION OF AMERICA, ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> BEFOUR, INC., J.R.A., INC., and JOSEPH ) <br> RINI ) <br> ) <br> Defendants. ) | No. 06 C 4459 <br><br> The Honorable William J. Hibbler |

## MEMORANDUM OPINION AND ORDER

A contractual relationship between Tanita Corporation and Befour, Inc. soured and gave rise to this suit. Tanita brings five breach of contract claims against Befour, four of which are based on separate purchase orders and the fifth based upon the letter of agreement between the parties. Tanita also brings claims for unjust enrichment, tortious interference, and conspiracy to tortiously interfere against Befour. Befour moves for summary judgment on all of Tanita's claims against it.

### I. Factual Background

Tanita is an Illinois corporation that distributes electronic scales. (Def. 56.1(a)(3) St. ¶ 2). In September 2002, Tanita and Befour entered into a contract under which Tanita would purchase scales manufactured by Befour and Befour would grant Tanita the exclusive rights to distribute certain products for three years. (Def. St. ¶ 6). The contract required Tanita to purchase 3,178 qualifying scales during the three year period and imposed a $340 penalty for each scale Tanita fell short of its quota. (Def. St. ¶ 7; Ex. 22 at T00590). Shortly after the parties entered the agreement, they realized that the period of exclusivity conflicted with one of Befour's pre-existing contracts and

1

so they modified the period of exclusivity to begin on June 7, 2003 and ending on June 7, 2006. (Def. St. ¶ 12; Ex. 23).

The contract required Tanita to provide 10-12 weeks notice when it placed an order, and called for the shipment of orders over a six-month period. (Def. St. Ex. 22 at T00591). The contract also allowed Befour to cease shipment if an invoice remained unpaid for longer than 45 days. (Def. St. Ex. 22 at T00591).

For the bulk of the period of exclusivity, the parties seemed to enjoy a mutually agreeable relationship. (Def. St. ¶¶14-19). Tanita, however, fell short of the 3,178 unit quota. (Def. St. ¶ 33). Befour sent Tanita an invoice for $640,900, representing a shortfall of 1,885 units multiplied by the $340 penalty. (Def. St. ¶ 33). Tanita shortly thereafter sent Befour a check for $443,360, subtracting 581 scales from Befour's calculations. (Def. St. ¶ 34). Tanita based its calculation on the number of scales it had ordered, including scales from four purchase orders that Befour had not delivered. (Def. St. Exs. 14-17, 26-27). Befour based its calculations on the number of scales for which Tanita had paid, regardless of when the scales were ordered.

In a tit-for-tat that quickly escalated into this lawsuit, Befour e-mailed Tanita regarding some outstanding invoices. (Def. Ex. 30). Tanita responded that the weekly budget was "tight" and that payment would be forthcoming. (Def. Ex. 30). When Tanita had yet to receive any of the 581 outstanding scale orders, it contacted Befour to inquire about the delay. (Muerte Dep. at 56-60). Befour's office manager told Tanita that it had ceased shipping scales because of the outstanding invoices, including the disagreement regarding the penalty provision. (Muerte Dep. at 56-60). Tanita then paid all outstanding invoices but for the disputed portion of the penalty. (Muerte Dep. at 56-60).

2

After the end of the exclusivity period, Tanita discovered that a former employee (and also a co-Defendant), Joe Rini had been in contact with Befour as early as November 2005. (Pl. 56.1(b)(3)(C) St. ¶ 22). Although Rini had agreed to a severance package that required him to refrain from "verbal or written communication detrimental to Tanita Corporation" and to honor a confidentiality clause, Rini nonetheless wrote to Befour three times in December 2005. (Pl. Ex. 12; Def. Exs. 17-19). In the first letter, written not even a week after Rini had signed the severance agreement, Rini informed Befour that he believed the "timing is right for Befour, Inc. to be presented to healthcare in an entirely new light," making its manufacturing capabilities known and assuring Befour of "several immediate opportunities" in the healthcare product supply chain. (Def. Ex. 17). The second letter answered a request from Befour and supplied it with names, contact information and a description of "four of the largest distributors in the Healthcare Industry," all of whom were Tanita customers. (Def. Ex. 18). The third letter discusses a meeting with representatives from two of Tanita's customers, both of whom "inquired about [Rini's] scale initiative," and inviting representatives from Befour to attend future meetings. (Def. Ex. 19).

Sometime early in 2006, Rini met with Befour representatives. (Rini Dep. at 62-69). At the meeting, Rini informed Befour of his nondisclosure and confidentiality agreement. (Rini Dep. at 69-70). At the same meeting, Rini also presented ideas to Befour how they might begin selling scales directly to market, rather than through a distributor. (Rini Dep. at 68-69). At some point, Befour engaged Rini as a consultant, paying him a commission to sell scales directly to former customers of Tanita, among others. (Rini Dep. at 77). Less than six weeks after the contract between Tanita and Befour ended, Befour had shipped scales to a former Tanita customer, which

had been sold to the customer by Rini. (Pl. Ex. 16). Befour was able to ship the scales to the customer only a single day after receiving the purchase order. (Pl. Exs. 16-17).

## II. Standard of Review

Summary judgment is appropriate only if there is "no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a material fact exists, a court construes all facts in favor of the non-moving party and draws all reasonable inferences in favor of that party. *Kelbanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir.2008). Although it is not a court's role to weigh the evidence or resolve conflicts in resolving summary judgment motions, a non-moving party must show there is evidence upon which a reasonable trier of fact could find for it. *De La Rama v. Illinois Dept. Of Human Serv.*, 541 F.3d 681, 685 (7th Cir.2008).

Summary judgment is often an appropriate mechanism for resolving cases involving the interpretation of written contracts. *International Union of United Auto., Aerospace and Agric. Implement Workers of Am. v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir.2003); *Moriarty v. Svec*, 164 F.3d 323, 330 (7th Cir.1998). That is because if a contract is susceptible to only one reasonable interpretation, it is unambiguous. And "[i]f a contract is unambiguous, by definition no material issues of fact exist regarding the contract's interpretation; the interpretation is a question of law for the court." *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc.*, 212 F.3d 373, 378 n.1 (7th Cir.2000) (citing *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir.1988)).

## III. Discussion

### A. *Breach of Contract Claims*

Befour's first moves for summary judgment on Tanita's breach of contract claims. Befour first argues that it did not begin selling scales to other companies until July 2006, approximately six weeks after the contract between it and Tanita terminated. This argument, however, grossly understates Tanita's breach of contract claim. Tanita alleged that Befour breached the letter of agreement by: 1) failing to fill pending purchase orders; 2) failing to notify Tanita that it would not fulfill purchase orders; 3) manufacturing a scale for another distributor during the exclusivity period; 4) issuing an overstated Penalty Invoice to Tanita; 5) and allowing or instructing Rini to contact Tanita's customers.

The record contains substantial circumstantial evidence to allow a reasonable fact-finder to find in favor of Tanita on these claims. First, the record contains evidence that Befour had substantial contacts with Rini prior to the end of the exclusivity period. During these contacts, Rini and Befour discussed, among other things, helping Befour sell its products directly to market and the names and contact information for several of Tanita's customers. Further, one e-mail from Rini suggests that Befour solicited this information from him. Rini also discussed with Befour several meetings he attended with representatives of Tanita's customers in which he pitched a "scale initiative."

In addition to these contacts, the record also demonstrates that just a single day after receiving a purchase order from one of Tanita's customers (admittedly after the exclusivity period had ended), Befour was able to ship that customer scales. Befour's speedy delivery of scales to a Tanita customer is particularly suspicious when considered in light of the fact that it required Tanita

to provide it with 10-12 weeks lead time in order to order parts to produce the scales and that it had a purchase order from Tanita that had been pending for nine months and two others that had been pending for six months.

Even though Befour continued to ship scales to Tanita through May 24, a reasonable factfinder could nonetheless find that Befour decided to abandon its obligations under the contract several months early. In short, a factfinder could find that Befour purposely dragged its feet in manufacturing and delivering the scales from Tanita's final purchase orders in order to artificially increase the amount of the penalty invoice and also to pounce swiftly upon a customer of Tanita's after the end of the exclusivity period. Although Befour may not have sold scales in violation of the exclusivity provision, the circumstantial evidence that Befour abandoned its obligations under the contract includes its contacts with Rini, its tardy shipment of scales to Befour, and its unprecedented, speedy delivery of scales to a former Tanita customer. That evidence is sufficient to demonstrate that Befour breached its obligations under the contract.

Befour next argues it was not required to ship the scales from the outstanding purchase orders because Tanita had breached its obligations under the contract. Under Befour's theory, by mid-June, Tanita had not paid invoices that had been outstanding for more than 45 days, which allowed Befour to cease shipment on Tanita's purchase orders. When Tanita paid those invoices, Befour argues, the penalty invoice, of which Tanita had paid only a portion, had been outstanding for more than 45 days, allowing it to continue to delay shipment of the scales.

Tanita first counters Befour's argument by suggesting that its failure to pay invoices within 45 days was not a material breach and therefore did not excuse Befour's non-performance. Wisconsin law does not excuse non-breaching party's from performance when the breach is "not

of the essence" or "relatively minor." *Ranes v. American Family Mut. Ins. Co.*, 219 Wis. 2d 49, 57, 580 N.W.2d 197, 201 (1998) (quoting *Management Comp. Serv., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 183, 557 N.W.2d 67 (1996)). Although Tanita offers an accurate statement of Wisconsin law, it is overly general and not applicable here. Whether Tanita's failure to pay timely all invoices it received from Befour was a material breach might be relevant if Befour had repudiated the contract, that is not what happened here. In this case, the clause requiring all invoices to be paid within forty-five days operated as a condition precedent for Befour's performance. Befour need not perform its obligations under the contract until certain conditions are met — one of which is the payment of outstanding invoices. Until all conditions precedent to performance are satisfied, a party cannot breach the contract by failing to perform as promised. *See Harley Paws, Inc. v. Mohns, Inc.*, 249 Wis. 2d 488, 2001 WL 1403557, at * 3 (Wis. App. Ct. 2001); *but see 3511 13th St. Tenants' Assoc. v. 3511 13th St., N.W. Residences, LLC*, 922 A.2d 439, 445 (D.C. 2007) (failure to pay timely earnest deposit money did not necessarily constitute material breach where earnest money represented small percentage of purchase price and where other facts indicated purchaser prepared to close timely). In any event, this dispute matters little because Tanita *did* pay the outstanding invoices and Befour nonetheless failed to ship the ordered scales.

Further, it is possible that Befour may be able to show that Befour breached the contract *before* the invoices raised by Tanita became past due. As noted earlier, part of Tanita's claim is that Befour intentionally dragged its feet during the exclusivity period. Befour did have contacts with Rini during the exclusivity period and Rini did have contacts with Tanita's customers during this period. Moreover, when the exclusivity period ended, Befour was able to ship scales to new customers immediately, despite having several orders from Tanita that had been pending for six or

7

more months. Tanita thus may be able to prove that Befour breached the contract by halting (or delaying) the manufacture of scales that it had ordered in order to manufacture scales for other customers during the exclusivity period, and that these actions occurred prior to any invoices becoming overdue.

Tanita's payment of the outstanding invoices resolves only one of Befour's arguments in defense of its refusal to ship the 581 scales. Befour also argues that its breach is excused because Tanita did not pay in full the penalty invoice. Befour premises its argument on the assertion that the penalty invoice accurately reflects the intention of the parties to include only scales that Befour manufactured and shipped and that Tanita paid for as scales that count towards the quota mentioned in the contract. Tanita, of course, disputes that premise. This dispute requires the Court to interpret the language of the contract.

Contract construction presents a question of law. *D.L. Anderson Lakeside Leisure Co. v. Anderson*, 757 N.W.2d 803, 812 (Wis. 2008). If the contractual language is unambiguous, courts apply it as written, without resort to the rules of construction. *Landshire Fast Foods of Milwaukee, Inc. v. Employers Mut. Cas. Co.*, 269 Wis.2d 775, 783, 676 N.W.2d 528, 532 (Wis. App. Ct. 2004). Under Wisconsin law, contract language is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.* Language that is not ambiguous in and of itself may be ambiguous in the context of the entire contract. *Noonan v. Northwestern Mut. Life Ins. Co.*, 298 Wis. 2d 247, 2006 WL 3314622, at *6 n. 13 (Wis. App. Ct. 2006).

The Letter of Agreement reads that "Tanita is responsible for purchasing a minimum number of electronic scales . . . during the three year exclusivity period," though nowhere in the contract do the parties define the parameters of this responsibility. Befour points to Wisconsin's Commercial

Code to argue that "purchase" requires either a sale or the creation of an interest in the property. Black's Law Dictionary defines a purchase as "the act or an instance of buying." (Black's Law Dict., Eight Ed. 1270). Such a construction, however, rips the word from the entire context of the contract, and strains common sense.

The contract, for example, requires that Tanita purchase a minimum number of scales during the three year exclusivity period. The contract, however, also required Tanita to provide Befour 10-12 weeks lead time for all new orders. Under Befour's interpretation of the quota requirements, it would be impossible for Tanita to "purchase" any scales during the first 12 weeks of the contract because any purchase orders submitted by Tanita the day the contract was signed could not be delivered (and thus "purchased") for 12 weeks. Likewise, it would also be impossible for Tanita to "purchase" any scales during the final 12 weeks of the contract because any purchase orders submitted during the exclusivity-period's wind down also could not be delivered and paid for during the three-year period of exclusivity. Yet, the quota requirement explicitly refers to a "three-year exclusivity period." The language defining a three-year period during which Tanita must purchase a certain number of scales would be rendered meaningless by Befour's interpretation of the contract. *Kasten v. Doral Dental USA, LLC*, 301 Wis.2d 598, 628, 733 N.W.2d 300, 315 (Wis. 2007) (when construing the language of a contract, courts give meaning to every word, avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage).[1]

Next, Befour's own conduct undermines its interpretation of the quota requirement. When Befour sent Tanita the penalty invoice, the document contained columns for "QTY Ordered," "QTY

---

[1] In addition, the letter of agreement allowed Tanita to schedule delivery as much as six months after the date of the first delivery. This clause, too, undermines Befour's interpretation of the quota requirement.

9

Shipped," and "Back Ordered."[2] Befour's conduct makes its own interpretation of the contract unreasonable. If the parties intended the quota requirement to limit qualifying scales to those for which the transaction was complete, there would be absolutely no reason for Befour to include a column for quantity ordered and back ordered on the penalty invoice. Instead, the invoice simply would indicate the number of scales *purchased*. Thus, when Befour both designed and sent the invoice, Befour itself contemplated that the penalty amount might be determined by the number of scales ordered.

In short, the Court finds that the language of the contract is ambiguous. Nowhere in the Letter of Agreement do the parties define the manner in which the quota count shall be determined. When the quota requirement is read in context with the entire Letter of Agreement and when Befour's own conduct is considered in submitting the penalty invoice, it is reasonable to conclude that the parties might have intended that any scales for which Tanita submitted a purchase order during the three-year exclusivity period would fulfill its obligations.

The ambiguous language of the contract requires findings of fact, and therefore the Court denies Befour's argument that it is entitled to summary judgment based upon Tanita's failure to pay the penalty invoice.

Befour has a final argument directed at Count IV, which concerns the May 2006 purchase order. Befour argues that the purchase order lacked the requisite signatures and therefore did not

---

[2] The Court notes also that the invoice is incorrect on its face, as Befour fails to indicate that Tanita had any outstanding purchase orders. The fact that Befour erred in identifying the number of scales that Tanita ordered provides further circumstantial evidence that would allow a reasonable finder of fact to conclude that it had purposely inflated the number of scales ordered both to ratchet up the amount of the penalty invoice and to avoid performance of its obligations under the contract.

create an enforceable contract. Tanita did send Befour a form letter that states that all purchase orders above a certain amount must have a signature from the President or Director. (Def. Ex. 21). Tanita, however, points to evidence of the parties course of dealing that suggests, despite this letter, the parties continued to do business without such signatures. (Pl. St. ¶ 36). The parties course of dealing creates an issue of material fact as to whether the parties intended the signature requirement was a necessary ingredient for the formation of a contract.

The Court DENIES Befour's motion for summary judgment on Counts I-V.

B.   *Unjust Enrichment Claim*

Befour next argues that it is entitled to summary judgment on Tanita's unjust enrichment claim. Befour notes that Tanita voluntarily paid the penalty invoice and therefore cannot now argue that it should be refunded that amount.

Wisconsin employs the voluntary payment doctrine. *See Putnam v. Time Warner Cable of S.E. Wis., Ltd. P'Ship*, 255 Wis. 2d 447, 457-58, 649 N.W.2d 626, 631-32 (Wis. 2002). The voluntary payment doctrine bars recovery of money voluntarily paid, with full knowledge of the facts, absent fraud or duress. *Id.* The voluntariness in the doctrine "goes to the willingness of the person to pay a bill *without protest as to its correctness or legality.*" *Id.* at 460, 649 N.W.2d at 633 (emphasis in original). Thus, the voluntary payment doctrine obliges a party to challenge a payment either before or at the time it makes the payment. *Id.* at 457, 649 N.W.2d at 631.

Tanita argues that the voluntary payment doctrine is not applicable because it did protest the penalty invoice. Befour sent Tanita a penalty invoice for $640,900. Tanita paid $443,360 and withheld $197,540, sending Befour a note along with its payment informing Befour that its

"calculation is based on a different amount." Tanita contends that this note constitutes a sufficient objection to overcome the voluntary payment doctrine. The Court disagrees.

The Wisconsin Supreme Court notes that a principle purpose of the voluntary payment doctrine is to "operate[] as a means to settle disputes without litigation by requiring the party contesting the payment to notify the payee of its concerns." *Id.* at 460, 649 N.W.2d at 633. Tanita alerted Befour of its objection to $197,540 of the penalty invoice, but Befour had no reason to believe that Tanita had any objection to the remaining $433,360. Tanita protested neither the correctness nor the legality of the $433,360 that it paid, and thus it was voluntary within the meaning of the voluntary payment doctrine.

Tanita makes a half-hearted assertion that issues related to its fraud and tortious interference claims make summary judgment on its restitution inappropriate. The penalty invoice, however, has little to do with Tanita's fraud or tortious interference claims. Tanita points to no evidence in the record that it would have ordered additional scales (and thus lowered the amount of the penalty invoice) in the absence of any alleged wrongdoing by Befour. The payment it made, therefore, is not related to its allegations of fraud. Tanita had full awareness of the facts regarding the penalty provision and the amount of scales it ordered at the time it made the payment.

If Tanita argues that the amount of the penalty invoice is unlawful, the Court notes that the Wisconsin Supreme Court has declined to enlarge the exceptions to the voluntary payment doctrine to include claims for unlawful liquidated damages. *Id.* at 464, 649 N.W.2d at 635.

The Court GRANTS Befour's Motion for Summary Judgment on Count VI.

C.   *Tortious Interference Claims*

Befour also seeks summary judgment on Tanita's tortious interference claim and the corresponding conspiracy claim. Contractual choice of law provisions govern tort claims only when it is clear that the parties intended the choice of law provision to have such breadth. *Kuehn v. Children's Hosp., Los Angeles*, 119 F.3d 1296, 1302 (7th Cir. 1997). Here, the choice of law provision contains a clause limiting it to disputes arising from the agreement, and so Tanita's tort claims are not governed by the choice of law provision of the contract, but instead by the law of the state with the "most significant relationship" to the alleged tort. Both parties agree that this state is Illinois.

To demonstrate tortious interference with a business relationship[3] under Illinois law, a plaintiff must demonstrate: 1) a reasonable expectation of entering into a valid business relationship; 2) the defendant's knowledge of the plaintiff's relationship; 3) purposeful or intentional interference by the defendant that prevents the expectation from ripening into a valid business relationship; and 4) damages to the plaintiff resulting from the interference. Befour argues that Tanita can not demonstrate purposeful interference because all of its actions took place after its contract with Tanita ended and thus only amount to legitimate business competition. Again, Befour casts Tanita's claims in far too narrow a scope and asks the Court to consider the evidence in the light most favorable to it.

As noted earlier, the record contains substantial evidence that Befour met with Rini several times prior to the termination of its contract with Tanita. During these contacts, Befour and Rini

---

[3] Tanita also claims that Befour tortiously interfered with its contracts. In its memorandum in support of summary judgment, Befour argues that Tanita's distributorship agreements did not rise to the level of legally binding contracts, thus defeating Tanita's claim. Tanita fails to respond to this argument, and the Court considers it to have abandoned this claim.

discussed selling Befour products directly to market. The record further contains evidence that despite having three open purchase orders, Befour ceased delivery of scales to Tanita prior to the termination of the contract and was able to ship scales to a former Tanita customer just a single day after receiving a purchase order. The record contains evidence that Rini had met with these former Tanita customers during the exclusivity period and that, at a minimum, Befour was aware of Rini's meetings with the customers. There is more than sufficient evidence for a reasonable factfinder to find that Befour intentionally stopped manufacturing scales for Tanita so that Tanita could not meet its customers' demands and then sent Rini into the field to undermine Tanita's relationships with these customers.

The Court therefore DENIES Befour's motion for summary judgment on Count VII. Because Befour's motion for summary judgment on the conspiracy claim rests upon a ruling in its favor on the underlying tortious interference claim, the Court also DENIES Befour's motion for summary judgment on Count XI.

D.  *Amount of Damages*

Finally, Befour argues that the Court should reduce Tanita's request for damages. Tanita admits that it included $1,024,000 in lost gross profits in its damages claim. (Def. St. ¶ 54). The basis for these lost gross profits are additional Befour scales that Tanita might have sold *after* the exclusivity period ended. Of course, nothing in the contract between Befour and Tanita obligated Befour to continue to fulfill Tanita purchase orders after the period of exclusivity terminated. The Court holds that Tanita's damages in Counts I-V are limited to the amount of profits it lost due to alleged breaches of the letter agreement and lost profit on items described in the purchase orders in

Counts I-IV. The Court further holds that Tanita may not recover damages on lost profits of scales it might have ordered after the exclusivity period.[4]

IT IS SO ORDERED.

1/5/09
Dated

Hon. William J. Hibbler
United States District Court

---

[4] Befour does not seek to limit Tanita's claims of damages to market share, damages due to lost sales of non-Befour products, or damage to the Tanita name. Accordingly, this holding applies only to Tanita's breach of contract claims.